# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| EUGENE KENNETH JONES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 4:06CV767RWS |
| | ) | |
| TROY STEELE, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Petitioner Eugene Kenneth Jones seeks a writ of habeas corpus.  Jones initially offered nineteen grounds for vacating his convictions, but withdrew seven of those grounds.  Jones alleges that his constitutional rights were violated when the state court denied his motions to suppress evidence, sustained the prosecution's objections thereby commenting on the merits of Jones' misidentification defense, empaneled a jury from a tainted venire, allowed the prosecution to violate discovery rules.  Jones also alleges the prosecution violated his due process rights by calling him an "urban predator" and claims constitutional infirmities in his state post-conviction proceedings.  Jones further alleges his Sixth Amendment rights were violated when he received ineffective assistance of counsel and that he was denied the right to represent himself at trial.

I referred this matter to a United States Magistrate Judge for a Report and Recommendation on all dispositive matters pursuant to 28 U.S.C. § 636(b).  On August 25, 2009, the Magistrate Judge filed his recommendation that Petitioner's habeas petition should be denied.  Jones objects to the recommendation that habeas relief be denied on grounds 15, 16, 17 and 18 only and requests a de novo review of those claims.

Because Jones withdrew grounds one, two, three, six, seven, twelve and nineteen from his amended petition for habeas corpus, I will not review them. Additionally, because Jones does not object to the Magistrate Judge's recommendations regarding claims four, five, eight, nine, ten, eleven, thirteen and fourteen, I will adopt and sustain the reasoning of the Magistrate Judge's on those grounds.

I have conducted a de novo review of Jones' claims as to grounds fifteen, sixteen, seventeen and eighteen.  After careful consideration, I will adopt and sustain the thorough reasoning of the Magistrate Judge as to grounds sixteen, seventeen and eighteen.  But for the reasons below, I will sustain Jones' objection to the Report and Recommendation as to ground fifteen and grant Jones' petition for a writ of habeas corpus on his claim that he was unconstitutionally denied the right to represent himself at trial.

## *Background*

Petitioner Eugene K. Jones is currently serving a thirty year term of imprisonment (consisting of one twenty year and two consecutive five year terms) for having been found guilty after a jury trial of an armed robbery netting $16.  In his report and recommendation, the Magistrate Judge provides a detailed description of the procedural history of Jones' jury trial and subsequent appeals as well as the facts established at Jones' trial and I adopt and incorporate that summary into my opinion here.

Before his trial Eugene K. Jones asserted his rights to represent himself under Faretta v. California, 422 U.S. 806 (1975).  I will describe in detail the facts surrounding Jones' waiver of his Sixth Amendment right to counsel.

On or about August 16, 2001, Jones filed a motion to proceed pro se.  The trial court set a hearing on Jones' motion for September 5, 2001.  Jones appeared at the September 5, 2001 hearing in person and with his appointed counsel, Michael Meyers.  At that hearing, the court conducted the following examination of Jones to determine whether his request to waive counsel was voluntary, knowing, and intelligently made:

Q     I'm going to be asking you a number of questions again in a variety of
      levels and some of them will be very basic and very fundamental because I
      don't quite frankly know you from Adam, nor you me, is that fair to say?

A.   That's right

Q.   I don't recall ever seeing you before in my life.  Is that about right?

A.   That's right.

Q.   Okay.  Can I ask you what your level of education is?

A.   Eleventh grade.

Q.   Do you have any type of physical or mental health problem?

A.   Well, this side of me is numb over here due to a stab assault in the institution that I'm in.  And I'm seeing a psychiatrist at the institution.

Q.   You say you're seeing a psychiatrist at the workhouse?

A.   Yes.

Q.   Have you ever been diagnosed as having any kind of mental disease or defect?

A.   No.

Q.   Now you've indicated that you have some numbness down your right arm, is that correct?

A.   Yes.

Q.   Are you right-handed?

A.   Yes, I am.

Q.   Does it affect your ability to write and take notes?

A.   No.

Q.   So you're able to write and take notes with your right hand?

A.    Yes.

Q.    Does it slow you down in any way?

A.    Yeah it slows me down.

Q.    Quite a bit?

A.    Well, on the average I would say, yeah.

Q.    Slows you down, okay.  Do you understand that if you're your own attorney, you're going to be in a courtroom and there's going to be a lot of things happening and that most people take notes during the time they're in court, do you understand that?

A.    Yes, sir.

Q.    Do you understand that your ability to take notes is going to be reduced because of your slowness, do you understand that?

A.    Yes, sir.

Q.    As we speak today are you currently under the influence of any drugs, alcohol or narcotics?

A.    No, sir.

Q.    Are you taking any medication for anything?

A.    No, sir.

Q.    Are you under a doctor's care for any reason other than seeing a psychiatrist?

A.    No, sir.

Q.    How many times do you see the psychiatrist?  Do you see the psychiatrist regularly?

A.    Once a week.

Q.    Once a week.  For how long?

A.    It started I would say August - - no, not August, I mean July the 24th.

Q.    Of this year?

A.    Yes.

Q.    Before July 24th of 2001 had you ever seen a psychiatrist or a psychologist before in your life?

A.    No, sir.

Q.    How old are you?

A.    I'm 41.

Q.    Do you understand the charges that have been filed against you?

A.    Yes, sir.

Q.    Do you know what they are?

A.    Yes, I do.

Q.    What are they?

A.    First degree robbery, armed criminal action, and unlawful use of a weapon.

Q.    Do you know what the penalties for those offenses are if a jury - - or if you were to be found guilty?

A.    Yes.

Q.    What are they?

A.      Robbery, ten to life.  Armed criminal action, ten to life.  And I think unlawful use of a weapon is three - - I don't know, I don't know exactly, but I know a $5,000 fine.

Q.      Before we proceed any further, let me say to you that the asking of the questions that I've got to ask conceivably could put you in a position where the answer might tend to incriminate you, so if you find that that's the case, just indicate that that's your belief and I won't push you any further on it, all right?

A.      Yes, sir.

Q.      It's not my intention here to do anything that would adversely affect your defense, do you understand that?

A.      Yes, sir.

Q.      And in keeping with that the Court will take judicial notice of its own file together with all the documents therein sua sponte.  Mr. Jones, I have to determine whether you have the capacity or ability to again as I indicated represent yourself here.  And again I don't want you to incriminate yourself, but I need - - one of the questions that would help me make that decision is whether or not you've ever been involved in any way in the criminal justice system before.

A.      No - - yes, I've been involved.

Q.      Have you ever had a trial by jury?

A.      No.

Q.      So you've never seen - - have you ever seen or witnessed a trial by jury?

A.      No.

Q.      Do you understand that the State of Missouri is a branch of, I mean the prosecutor's office is a branch of the government in the State of Missouri, do you understand that?

A.    Yes.

Q.    Do you understand that it appears to this Court that they are seeking your incarceration, do you understand that?

A.    I understand that, your Honor.

Q.    And you understand that you have a right to have an attorney to defend you against those charges?

A.    Yes.

Q.    It's my understanding that Mr. Meyers has been assigned from the office of the public defender to represent you, is that correct?

A.    That's correct.

      MR. MEYERS:    Judge, just for the Court's information it was originally assigned to Jeff Tisoto and after he left our office it was assigned to me late July, July 27th.

Q.    So a little more than a month ago?

A.    Yes.

Q.    Have you had the opportunity talk [sic] with Mr. Meyers about your case yet since he's only been on it for a short time?

A.    Yes, I talked to him.

Q.    Do you have any complaints about Mr. Meyers?

A.    I don't know him.

Q.    When you talked with him did ask him questions?

A.    No, not really.

Q.      Is there anything at all about your request to represent yourself that has anything to do with Mr. Meyers or your belief in his ability to represent you?

A.      Yeah.

Q.      All right.  Want to explain that?

A.      I just feel that even though Mr. Meyers have a concern for me, he just don't have the concern that I'm looking for.

Q.      Did you express that to him?

A.      No.

Q.      Is that the reason you want to represent yourself?

A.      Well, not more so that being the reason, you know, my past experience is also I haven't been so successful with state appointed attorneys and I just feel it's in my best interests, you know, to represent myself concerning the situation that I'm facing.

Q.      So is this anything to do with what Mr. Meyers has said or done that made you think that he doesn't care about you?

A.      No, I know he do.  I'm just saying I just care about myself a hell of a lot - - excuse my French - - so I'm going to put in my whole effort to trying to, you know, seek out what's best for me.

Q.      Is there anything that Mr. Meyers has said or done or not said or not done that would make you think that he would do anything less than the best he could possibly do?

A.      No, we haven't had very much time to talk.

Q.      Do you understand that there are rules of procedure that take place in the trial of any case?

-9-

A.     Yes.

Q.     Have you ever looked at any of those rules?

A.     No.

Q.     Do you understand that if you are allowed to represent yourself, you will be held to those rules?

A.     Yes.

Q.     Do you understand that?

A.     Yes, sir.

Q.     You will be held to the same rules that any person who has gone through college and gone through law school would be held to, do you understand that?

A.     Yes, sir.

Q.     Do you understand basically you'd be held to the same rules that Mr. Meyers would be held to because he's gone through college and gone through law school as well, do you understand that?

A.     Yes, sir.

Q.     Have you spent any time in the law library while you've been incarcerated?

A.     Yes.

Q.     Do you have any idea how much time?

A.     Not exactly.

Q.     More than five hours?

A.     Yes.

Q.    More than ten?

A.    Yes.

Q.    You understand that I would not be able to guarantee how many hours you would have access to the law library 'cause that's not totally within my control, do you understand that?

A.    Yes, sir.

Q.    Now the prosecution has charged you as what's called a prior and persistent offender.  If they are able to prove you to be such, do you know what the consequences of that could be?

A.    I have an imagination, yes.

Q.    Well, why don't you tell me what your imagination says about that, what you think that means.  What would be the consequences of them being able to show you to be a prior and persistent offender?

A.    85 percent of the time that I may be granted.

Q.    Any other consequences that you could know of as to being found to be either a prior or a prior and persistent offender?

A.    No. Just I know it's not going to be nothing nice.

Q.    Are you aware of any recommendations that the State may or may not have made at this point?

        MS. BRYANT:     Not yet, your Honor.

        THE COURT:     There haven't been?

        MS. BRYANT:     No, your Honor.  The case is new.

Q.    Okay, Obviously you can't be aware of something that doesn't exist.

-11-

A.    That's right.

     MS. BRYANT:    Off the record.

                   (At this time a discussion was held off the record.)

     MS. BRYANT:    I can tell you that, Judge, with the record of the defendant it's not going to be a minimum offer at all.

     THE COURT:    Okay.  That's your expectation?

     MS. BRYANT"    My expectation.

Q.    You understand, Mr. Jones, that if you are found guilty, that the overwhelming liklihood is that you could be, there would be imposition of some sentence of imprisonment?

A.    Yes.

Q.    You understand, in fact, if you were found guilty on the armed criminal action charge, that probation is even not allowed and is not authorized, do you understand that?

A.    Yes, sir.

Q.    Now do you have any resources available to you to retain counsel?

A.    No.

Q.    Has anyone threatened or coerced you or any member of your family in any way to get you to make this decision?

A.    No.

Q.    Have there been any promises made to you by anyone with respect to this decision?

A.    No.

Q.     Is your request completely voluntary?

A.     Yes, it is.

Q.     While there are a number of limitations to this, do you understand that any
       recommendations by the prosecuting attorney, circuit attorney here, would
       not be binding on a judge and that those recommendations may or may not
       be accepted by a judge, do you understand that?

A.     Yes, sir.

Q.     Is there anything at all that you wish to say to me with respect to this request
       that we have not covered?

A.     No, sir.

Resp't Ex. C.

The trial court did not rule on Jones' motion at the hearing, and instead

stated, "Mr. Jones, I'm going to review the applicable statutes together with our

discussion here this morning and I will as soon as I can get a memo out to you

indicating my ruling on your motion."  Resp't Ex. C at 14.  Two days later, the

court denied Jones' motion to proceed pro se for two reasons: (1) Jones' waiver

was not "in proper form;" and (2) Jones' waiver was not knowing and intelligent.

The court explained,

> In addition to finding that Defendant's purported waiver of
> counsel is not in proper form, the Court herewith, finds that
> it is not knowing and intelligent because, *inter alia*,
> Defendant faces very serious charges herein with very
> significant potential prison sentences and has never even
> familiarized himself with the applicable rules of procedure;

-13-

the Defendant has only an 11th grade education and a reduced physical ability to take trial notes; the Defendant did not know the relevant ranges of punishment for two of the three charges against him and he did not know the consequences of being proven as a prior or prior and persistent offender.  The Court, further, notes that if the Defendant understood and appreciated the potential consequences of this request, by virtue of this Court's ORDER of August 27, 2001, he had notice of and time to prepare for the above hearing so that he could answer the fundamental questions asked.

Resp't Ex. A at 17.

Jones renewed his request to waive counsel on January 20, 2003.  In his written request, he recognized that he was "looking at a maximum sentence of Life, etc. on the above charges," and that the sentences might run consecutively. See Resp't Ex. A at 20. The court again denied Jones' request.

Jones appealed the court's decision denying him the ability to represent himself.  It was his sole point on direct appeal.  The Missouri Court of Appeals held as follows:

A criminal defendant who makes a knowing, voluntary, and intelligent waiver of the right to counsel may not be tried with counsel forced upon him by the state.  State v. Hampton, 959 S.W.2d 444, 447 (Mo. 1997) (en banc) (citing Faretta v. California, 422 U.S. 806, 835-36 (1975)).  However, the right to self-representation is not absolute.  Funke, 903 S.W.2d at 243.  A court must "indulge in every reasonable presumption against [a defendant's] waiver" of his right to counsel.  Hampton, 959 S.W.2d at 447 (citing Hamilton v. Groose, 28 F.3d 859, 862 (8th Cir. 1994)).  A

-14-

defendant's waiver is knowing when he actually understands the significance and consequences of a particular decision and his waiver is voluntary when his decision is uncoerced and an exercise of his informed free will. State v. Shafer, 969 S.W.2d 719, 729 (Mo. banc 1998). The judge must investigate "as long and as thoroughly as the circumstances of the case before him demand." State v. Watson, 687 S.W.2d 667, 669 (Mo. App. E.D. 1985) (citing Vol Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)). A valid waiver is made when the defendant has "an apprehension of the nature of the charges; the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." Watson, 687 S.W.2d at 669. The test for determining if the waiver is made intelligently and knowingly depends on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. State v. Hunter, 840 S.W.2d 850, 858 (Mo. banc 1992).

In Shafer, the Missouri Supreme Court employed the eight specific factors for evaluating waiver of counsel...set out in United States v. Cash, 47 F.3d 1083, 1088-89 (11th Cir. 1995). 969 S.W.2d at 728. The factors to determine whether waiver of counsel is made knowingly, voluntarily, and intelligently are: 1) the defendant's age, educational background, and physical and mental health; 2) the extent of the defendant's contact with lawyers prior to trial; 3) the defendant's knowledge of the nature of the charges, possible defenses, and penalties; 4) the defendant's understanding of the rules of procedure, evidence, and courtroom decorum; 5) the defendant's experience in criminal trials; 6) whether standby counsel was appointed and the extent to which that counsel aided the defendant; 7) any mistreatment or coercion of defendant; and 8) whether the defendant was trying to manipulate events of the trial. Id. The court in Shafer explained that all eight

-15-

factors may not have equal importance in each instance of waiver of counsel. Id.

Here, on the first factor, the trial court found that [petitioner] had an eleventh grade education, was seeing a psychiatrist, and had numbness down his right arm from a stab wound which made it difficult for him to take notes. On the second factor, the record shows that [petitioner] was appointed a public defender and the two met one time during the month since the public defender was appointed to him. On the third factor, the trial court found that [petitioner] understood that he was charged with first-degree robbery, armed criminal action, and unlawful use of a weapon. However, he did not understand the potential sentences for each of these charged offenses nor did he understand the consequences of being proven a prior or prior and persistent offender. On the fourth and fifth factors, the trial court found that [petitioner] had no understanding of the court's procedural rules and had never seen a jury trial. On the sixth factor, the record does not show that the court appointed a standby attorney. On the seventh factor, the record shows that there was no mistreatment or coercion of [petitioner]. On the eighth factor, the trial court did not make a finding as to whether [petitioner] was trying to manipulate the events of trial. Additionally, the record shows [petitioner] understood he would be held to the same rules as an attorney who had gone through college and law school would be held to in court and he had spent more than ten hours in the law library.

We find that the trial court conducted a thorough investigation into whether [petitioner] waived his right to counsel knowingly, voluntarily, and intelligently. We find no error plain or otherwise. Point denied.

Resp't Ex. F.

## *Standard of Review*

The power of a federal court to grant a writ of habeas corpus is governed by

28 U.S.C. § 2254.  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained

the standard for reviewing a state habeas case.  With respect to the "contrary to"

language, a state court decision is contrary to clearly established Federal law "if

the state court arrives at a conclusion opposite to that reached by [the Supreme]

Court on a question of law or if the state court decides a case differently than [the

Supreme] Court has on a set of materially indistinguishable facts."  Id. at 413.

Under the "unreasonable application" clause of § 2254(d), a district court may

grant a writ of habeas corpus "if the state court identifies the correct governing

legal principle from [the Supreme Court's] decisions but unreasonably applies that

principle to he facts of the prisoner's case." Id.  "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.  "An *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 410.  It is a substantially higher threshold.  Schiro v. Landrigan, 550 U.S. 465, 473 (2007).

## *Discussion*

### *The burden shift*

The Sixth Amendment guarantees a criminal defendant the right to the assistance of counsel in his defense and the right to self-representation.  Faretta v. California, 422 U.S. 806, 818–821 (1975). "[T]he Supreme Court has clearly established that the presiding court must inquire into [the defendant's] understanding of the right and ***must warn him*** of the dangers involved in order to ensure that he has full knowledge of the consequences" of exercising his constitutional right to self-representation.  Shafer v. Bowersox, 329 F.3d 637, 647 (8th Cir. 2003) (emphasis added).  The Supreme Court has explained that

> [w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those

-18-

> relinquished benefits. . . . [He] ***should be made aware*** of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."

*Faretta*, 422 U.S. at 835 (emphasis added).  "The fact that an accused may tell [the judge] that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility."  Von Moltke v. Gillies, 332 U.S 708, 724 (1948) (plurality opinion).  The "[w]arnings of the pitfalls of proceeding to trial without counsel . . . ***must be rigorously conveyed***."  Iowa v. Tovar, 541 U.S. 77, 89 (2004) (emphasis added).

In this case, the Missouri Attorney General admits that *Faretta* required the trial court to inform Jones of the dangers and disadvantages of self-representation, but the trial court never did so.[1]  422 U.S. at 835; Tovar, 541 U.S. at 88–89.  Because there was no such warning, the Missouri Attorney General argues that "[f]or this reason alone, the trial court would have erred in *granting* Jones' motion."  This view of the *Faretta* inquiry improperly shifts the burden from the trial court to the defendant.  The *Faretta* inquiry is not a trivia contest where the court tests the defendant's independent knowledge of the rights he is relinquishing.  In fact, in *Faretta*, the Supreme Court reversed the trial court that

---

[1] Respondent's Response to Amended Petition for a Writ of Habeas Corpus [Doc. 21], p. 29.

-19-

engaged in just this type of "tell me what you know" inquiry.  422 U.S. at 808 n.3.

Instead, the purpose of the Faretta inquiry is to convey warnings to the defendant

and ensure that in light of those warnings, he still wishes to proceed without

counsel.  See Tovar, 541 U.S. at 87–93.

The Missouri Court of Appeals and the trial court, however, denied Jones of

the constitutional right to self-representation because he did not *independently*

know the entire sentencing range for the crimes for which he was accused

(although he did know the maximum possible penalty) and he did not

*independently* know the consequences of being proven a prior or prior and

persistent offender under Missouri law.  Neither the Missouri Attorney General

nor the Missouri Court of Appeals have identified any law supporting the

proposition that a court can reasonably hold a defendant responsible for the trial

court's failure in this regard.  By requiring that Jones *independently* know all of

the consequences of waiving his right to counsel, the state court unreasonably

applied clearly established Federal law as determined by the Supreme Court that

the burden is on the trial court to inform the defendant.

In addition to unreasonably shifting the court's burden to the defendant, the

state court unreasonably relied on factors that have either been rejected by the

United States Supreme Court (such as Jones' lack of knowledge of the court's

procedural rules) or cannot reasonably form the basis for rejecting Jones'
attempted waiver, specifically that he was physically disabled, had an eleventh
grade education, had visited a psychiatrist (but was not diagnosed with any mental
diseased or defect), and was aware of only the maximum sentence he faced.

*Jones' lack of knowledge of the procedural rules*

In rejecting Jones' waiver, the trial court stated that Jones had "never even
familiarized himself with the applicable rules of procedure." The Missouri Court
of Appeals endorsed the consideration of this factor when it found that Jones
understood that he would be held to the same rules as an attorney who had gone
through college and law school would be held and had spent more than ten hours
in the law library, but the defendant "had no understanding of the court's
procedural rules."

Before addressing why the state court's consideration of this factor was not
a reasonable application of Supreme Court precedent, I note that the Missouri
Court of Appeals relied upon State v. Shafer, 969 S.W.2d 719 (Mo. 1988) which
adopted the factors enumerated in United States v. Cash, 47 F.3d 1083 (11th Cir.
1995). In Shafer, the Missouri Supreme Court affirmed the defendant's
convictions, but a federal habeas court concluded that the Missouri Supreme Court
had unreasonably applied clearly established federal law and the Eighth Circuit

affirmed.  <u>Shafer</u>, 329 F.3d at 640, 651, 655.  The Eighth Circuit recognized that a reasonable application of the <u>Cash</u> factors was not dispositive because the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a federal court to focus on the requirements set by the Supreme Court.  <u>Id.</u> at 651.  As a result, the Supreme Court's decisions, and not the correct application of the <u>Shafer</u> factors act as my guide as well.

The state court's determination that Jones' waiver was not knowing and intelligent because he had not familiarized himself with the applicable rules of procedure was an unreasonable application of  <u>Faretta</u>.  The state court correctly identified the <u>Faretta</u> principle of the right to self-representation, but then it then unreasonably relied on a factor that the Supreme Court previously expressly rejected.  In <u>Faretta</u>, the Supreme Court stated that a defendant's "technical legal knowledge . . . was not relevant to an assessment of his knowing exercise of the right to defend himself."  422 U.S. at 836.  It was therefore unnecessary to make an "assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire."  <u>Id.</u>  In <u>Faretta</u>, the trial court's warning that the defendant "would be required to follow all the 'ground rules' of trial procedure" was

sufficient.  422 U.S. at 836.  In this case, the trial court adequately explained that

Jones would be required to follow the rules of procedure:

> Q.    Do you understand that there are rules of
>       procedure that take place in the trial of any case?
>
> A.    Yes.
>
> Q.    Have you ever looked at any of those rules?
>
> A.    No.
>
> Q.    Do you understand that if you are allowed to
>       represent yourself, you will be held to those rules?
>
> A.    Yes.
>
> Q.    Do you understand that?
>
> A.    Yes, sir.
>
> Q.    You will be held to the same rules that any person
>       who has gone through college and gone through
>       law school would be held to, do you understand
>       that?
>
> A.    Yes, sir.
>
> Q.    Do you understand basically you'd be held to the
>       same rules that Mr. Meyers would be held to
>       because he's gone through college and gone
>       through law school as well, do you understand
>       that?
>
> A.    Yes, sir.

Resp't Ex. C at 9–10.

-23-

Jones understood that he would be required to follow the rules of trial procedure. As a result, the state court unreasonably considered Jones' lack of understanding of the court's procedural rules at the time of his hearing.

*Jones' physical disability*

The trial court rejected Jones' waiver because Jones had "a reduced physical ability to take trial notes." The Court of Appeals accepted this as a proper factor to consider and noted that Jones "had numbness down his right arm from a stab wound which made it difficult for him to take notes."

At his <u>Faretta</u> hearing, Jones stated that he was able to write and take notes, but that his injury "slow[ed] him down." Resp't Ex. C at 4. Jones clearly stated that he was aware that attorneys usually take notes in court and that he understood that he had a reduced ability to take notes:

> Q.    Now you've indicated that you have some
>        numbness down your right arm, is that correct?
>
> A.    Yes.
>
> Q.    Are you right-handed?
>
> A.    Yes, I am.
>
> Q.    Does it affect your ability to write and take notes?
>
> A.    No.

-24-

> Q.      So you're able to write and take notes with your right hand?
>
> A.      Yes.
>
> Q.      Does it slow you down in any way?
>
> A.      Yeah it slows me down.
>
> Q.      Quite a bit?
>
> A.      Well, on the average I would say, yeah.
>
> Q.      Slows you down, okay.  Do you understand that if you're your own attorney, you're going to be in a courtroom and there's going to be a lot of things happening and that most people take notes during the time they're in court, do you understand that?
>
> A.      Yes, sir.
>
> Q.      Do you understand that your ability to take notes is going to be reduced because of your slowness, do you understand that?
>
> A.      Yes, sir.

Resp't Ex. C at 4.  Shortly after this discussion, Jones reiterated his desire to represent himself, "I just feel it's in my best interests, you know, to represent myself concerning the situation that I'm facing."  Resp't Ex. C at 9.

Although the Supreme Court recently held that the state may force counsel upon a defendant who lacks the *mental capacity* to conduct his trial defense, there has never been any indication from the Supreme Court that a trial court may deny

-25-

a defendant the right to self-representation based on a "reduced physical ability to take trial notes" or "numbness down his right arm from a stab wound which made it difficult for him to take notes." See Indiana v. Edwards, 128 S.Ct. 2379, 2386–88 (2008) (defendant lacking mental competence may be prevented from representing himself).  The record does not indicate that Jones' reduced ability to take notes would cause a deliberate disruption of the trial.  See Faretta, 422 U.S. at 834 n.46.

The nature of the Faretta inquiry is to assure that the defendant's waiver is intelligently and knowingly made.  In this case, Jones was clearly aware of his disability and the effect it would have on his ability to take notes at his trial and keep track of what occurred in the courtroom during his trial.  Jones made his decision to represent himself "with eyes open" to the fact that he did not write as quickly as the trial court would hope.  Both the trial court and the Court of Appeals concluded that Jones' physical limitation in his ability to take notes rendered his waiver unknowing and unintelligent.  The trial court's reliance on this factor, and the Missouri Court of Appeals' decision to embrace it, is unreasonable.  Reliance on this factor assumes that a person's (minor)[2] *physical*

_____

[2] Jones stated that he is able to write and take notes.

-26-

disability renders a person unintelligent.  Such a finding would never be applied to a similarly situated attorney representing a defendant in a trial.

*Jones's education*

The state courts also found Jones' waiver unknowing and unintelligent because, *inter alia*, he had "an eleventh grade education."  A court may consider whether the defendant is literate when evaluating whether a waiver is effective. Faretta, 422 U.S. at 835.  For example, in Faretta, the Supreme Court recognized that Faretta was literate and had completed his high school education.  Id. at 807, 835.  Additionally, the defendant's education level will affect the "information a defendant must possess in order to make an intelligent election."  Tovar, 541 U.S. at 88.  In this case, Jones was clearly literate as evidenced by his submissions to the court and the fact that he had spent more than ten hours in the law library.

The state court's denial of Jones' right to self-representation based on his completion of only eleventh grade was an incorrect application of clearly established federal law.

But Jones' conviction cannot be overturned merely because the state court incorrectly applied federal law; the application must also have been unreasonable. Williams, 529 U.S. at 411.  To determine whether the state court unreasonably applied federal law, I looked at decisions from more than a dozen jurisdictions.  A

defendant's mere lack of formal education does not render his waiver of counsel unknowing or unintelligent. See, e.g., United States v. McKenzie, 160 Fed App'x 821, 825–27 (11th Cir. 2005) (eleventh grade education); United States v. Todd, 424 F.3d 525, 530–33) (7th Cir. 2005) (tenth grade education); United States v. Garcia-Hernandez, 75 Fed App'x 412, 415–16 (5th Cir. 2003) (sixth grade education); United States v. Benefield, 942 F.2d 60, 64 (1st Cir. 1991) (seventh grade education); State v. Nicolosi, 588 S.W.2d 152, 157 (Mo. Ct. App. 1979) (fourth grade education); People v. Ward, 567 N.E.2d 642, 644–49 (Ill. App. Ct. 1991) (tenth grade education); State v. Milton, 705 N.W.2d 107, 2005 WL 1630040 (Iowa Ct. App July 13, 2005) (eleventh grade education); Deere v. State, 785 S.W.2d 31 (Ark. 1990) (eight grades of formal education); State v. Davis, 2008 WL 2168248 (Minn. Ct. App. May 27, 2008) (eleventh grade education); De la Fuente v. State, 264 S.W.3d 302, 306 (Tex. Civ. App. 2008) (seventh grade education); State v. Brown, 907 So.2d 1, 23–24 (La. 2005); Redington v. State, 678 N.E. 114 (Ind. Ct. App. 1997) (tenth grade education); Callahan v. State, 333 S.E.2d 179 (Ga Ct. App. 1985) (eleventh grade education); State v. Fulp, 558 S.E.2d 156 (N.C. 2002) (ninth grade education).

The fact that a defendant has only completed the eleventh grade, or even the fourth grade, is not enough, absent other evidence, to conclude that the defendant

was unable to intelligently or knowingly waive his right to counsel.  The record does not reflect that Jones' lacked the mental ability to intelligently waive his right to counsel or that his waiver was unknowing.  Jones was aware of the nature of the charges against him, understood that he faced life in prison if convicted and had spent more than ten hours in the law library.  As a result, I believe the state court's decision to deny Jones his constitutional right to self-representation on the basis that he had only attended the eleventh grade was an unreasonable application of clearly established federal law.

*Jones' visits to the jail psychiatrist*

The trial court did <u>not</u> rely on Jones' visits to the jail psychiatrist when it determined that Jones' attempted waiver was not knowing and intelligent.  Despite the fact that <u>nowhere</u> in the trial court's order is Jones' psychiatric health discussed, the Court of Appeals incorrectly stated that "***the trial court found*** that [Jones] had an eleventh grade education, ***was seeing a psychiatrist***, and had numbness down his right arm from a stab wound which made it difficult for him to take notes."  Resp't Ex. F at 4 (emphasis added).  However, a review of the transcript indicates that although Jones had visited with a psychiatrist while in state custody, Jones had never been diagnosed with any kind of mental disease or defect.

-29-

The Supreme Court has explained that a state may force representation by counsel upon those who are competent enough to stand trial, "but who suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." Edwards, 128 S.Ct. at 2388.  But this is not that type of case.  Jones indicated that he had visited a psychiatrist weekly at the jail for approximately 6 weeks,[3] was 41 years old, had never visited a psychiatrist or psychologist before six weeks earlier, and that he had never been diagnosed with *any kind* of mental disease of defect.  Resp't Ex. C at 3, 5.  No evidence was presented that Jones suffered a severe mental illness and the record does not reflect that Jones behaved in a manner indicative of mental illness or was disruptive.  To the contrary, the transcript indicates that Jones answered every question in a cogent and thoughtful manner and was polite and respectful to the court.  The trial judge did not make any observations about <u>any</u> aberrant behavior by Jones during the proceedings.  I believe that no reasonable jurist could conclude that Jones suffered from a severe mental illness that would make him incompetent to conduct the trial proceedings or that Jones' limited visits with a jail psychiatrist rendered him unable to make a knowing and intelligent waiver of his right to counsel.

---

[3] From July 24, 2001 to September 5, 2001.

*Jones knowledge of the range of allowable punishments*

In order for a waiver to be valid, the record should "establish that [the defendant] knows what he is doing and his choice is made with eyes open." Faretta, 422 U.S. at 835. In an old plurality decision, the Supreme Court suggested that "[t]o be valid such a waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other factors essential to a broad understanding of the whole matter." Von Moltke, 332 U.S. at 724.

It is unclear whether Von Moltke qualifies as clearly established law for purposes of § 2254(d). In Wilkins v. Bowersox, a pre-AEDPA case, the Eighth Circuit cited Von Moltke for the requirements of a valid waiver of counsel. 145 F.3d 1006, 1011 (8th Cir. 1998). After AEDPA took effect, the Eighth Circuit seemed to indicate that, despite being a plurality decision, Von Moltke qualified as clearly established law. Shafer, 329 F.3d at 651. This year, the Eighth Circuit clarified that "[n]either the Supreme Court nor this court, however, has adopted the Von Moltke plurality opinion in all of its particulars, and we reject [the defendant's] contention that a waiver of the right to counsel must exhibit all of the

-31-

features discussed in Wilkins before it is deemed knowing and voluntary." United States v. Kiderlen, 569 F.3d 358, 367 (8th Cir. 2009).

The Eighth Circuit's decision in Kiderlen reflects the Supreme Court's approach in its 2004 Iowa v. Tovar decision where it explained,

> We have described a waiver of counsel as intelligent when the defendant "knows what he is doing and his choice is made with eyes open." *We have not, however, prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel.* The information a defendant must possess in order to make an intelligent election, our decisions indicate, will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.

541 U.S. at 88 (internal citations omitted) (emphasis added). Because the Supreme Court has explained that there is no formula for what information must be conveyed to a defendant before a waiver is deemed effective, I believe Von Moltke does not qualify as clearly established law in the sense that adherence to all its particulars is necessary to effectuate a valid waiver.

I turn now to one Von Moltke factor in particular, "the range of allowable punishments." In the instant case, the trial court stated one of the bases for rejecting Jones' waiver was that Jones "did not know the relevant ranges of punishment for two of the three charges against him and he did not know the consequences of being proven as a prior or prior and persistent offender." Resp't

Ex. A at 17.  The Court of Appeals agreed that Jones' waiver was unintelligent because Jones "did not understand the potential sentences for each of these charged offenses nor did he understand the consequences of being proven a prior or prior and persistent offender." Resp't Ex. F at 4.  Putting aside for the moment the fact that it was the trial court's duty to inform Jones and not engage in the "tell me what you know" inquiry rejected in <u>Faretta</u>, it is important to look at the hearing transcript to have a full understanding of what Jones understood about the sentencing range.  During the trial court's inquiry, the court asked Jones:

> Q. Do you understand the charges that have been filed against you?
>
> A. Yes, sir.
>
> Q. Do you know what they are?
>
> A. Yes, I do.
>
> Q. What are they?
>
> A. First degree robbery, armed criminal action, and unlawful use of a weapon.
>
> Q. Do you know what the penalties for those offenses are if a jury - - or if you were to be found guilty?
>
> A. Yes.
>
> Q. What are they?

> A.    Robbery, ten to life.  Armed criminal action, ten to
> life.  And I think unlawful use of a weapon is three -
> - I don't know, I don't know exactly, but I know a
> $5,000 fine.

Resp't Ex. C at 5–6.  Jones correctly believed the range of punishment for first

degree robbery to be ten years to life.  Under Missouri law, the range of

punishments for first degree robbery is "not less than ten years and not to exceed

thirty years, or life imprisonment."  Mo. Rev. Stat. §§ 558.011.1(1), 569.020.

Jones correctly identified the maximum punishment for armed criminal action as

life, but mistakenly believed the minimum sentence to be ten years.  The sentence

range for armed criminal action is three years to life.  Mo. Rev. Stat. § 571.015;

Clemons v. Armontrout, 921 F.2d 187 (8 th Cir. 1990).  Jones admitted that he was

not sure about penalty for unlawful use of a weapon, and the trial court did not

inform him.

Although Jones correctly identified the maximum penalty he was facing if

convicted, both the trial court and the Court of Appeals concluded that Jones could

not make a knowing and intelligent waver because he did not independently know

the entire range of punishment.  The issue before me is whether that conclusion

was an unreasonable application of Faretta's requirement that Jones understood

"the dangers and disadvantages of self-representation."  422 U.S. at 835.  Faretta is

satisfied when the defendant is informed of the maximum penalty; it is not

-34-

necessary that he knows the minimum penalty.  <u>See, e.g.</u>, <u>United States v. Mahasin</u>, 442 F.3d 687, 691 (8th Cir. 2006) (finding valid waiver where defendant "understood the crimes he was charged with and ***maximum*** penalties authorized if the jury found him guilty); <u>United States v. Royal</u>, 322 Fed App'x 226, 230 (3d Cir. 2009) (finding valid waiver where district court "described the ***maximum*** potential penalties of the charges against" the defendant); <u>United States v. Talley</u>, 315 Fed App'x 134, 137, 143 (11th Cir. 2008) (finding valid waiver where district court discussed the ***maximum*** penalties for each count); <u>United States v. Johnson</u>, 534 F.3d 690, 694 (7th Cir. 2008) (finding valid waiver where defendant "understood the charges against him and the ***maximum*** penalties they carried"); <u>State v. Gaydarzhi</u>, 2009 WL 2437237 at *5 (Was. Ct. App. Aug. 11, 2009) ("At a minimum, a defendant must understand the severity of the charges; the ***maximum*** possible penalties for the charged . . . ."); <u>State v. House</u>, 2008 WL 5223003 (N.C. Ct. App. 2008) ("The trial judge then explained to defendant the charges against him and the possible ***maximum*** sentences he could face if convicted.")

While the state court acted reasonably in considering Jones' understanding of the possible punishments facing him, it was unreasonable to conclude that Jones could not intelligently and knowingly waive his right to counsel because he did not understand the low end of the penalty range.  This is especially unreasonable in

Jones' case because the court required that Jones independently know the range when it is in fact the court's duty to make the defendant aware of the dangers and disadvantages of self-representation.

### Conclusion and Certificate of Appealability

There is an old adage that he who represents himself at trial has a fool for a client.[4]  The issue before me is not whether Jones would benefit from counsel. Rather the issues before me are whether the state court denied Jones the right to represent himself and whether that decision was an unreasonable application of federal law as determined by the United States Supreme Court.

I conclude that Jones was unconstitutionally denied the right to represent himself and the state court's decision was an unreasonable application of the Sixth Amendment.  As a result, Jones is entitled to a writ of habeas corpus ordering Respondent to release Petitioner from all custody resulting from this Judgment and Sentence within ninety (90) days after this Order becomes final (including any appeals that may be taken) if State of Missouri does not commence proceedings to afford Petitioner Eugene Jones a new trial.  I find that all other claims for habeas relief are either procedurally barred or fail on the merits and must be denied

---

[4]  Like many others, this axiom is frequently attributed to Abraham Lincoln, primarily because its actual origins are unknown.

I have also considered whether to issue a certificate of appealability on Jones' other claims.  To grant a certificate of appealability, the Court must find a substantial showing of the denial of a federal constitutional right.  See Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997).  A substantial showing is a showing that issues are debatable among reasonable jurists, a Court could resolve the issues differently, or the issues deserve further proceedings.  Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997) (citing Flieger v. Delo, 16 F.3d 878, 882-83 (8th Cir. 1994).  Because Jones has not made such a showing on his other claims, I will not issue a certificate of appealability.

Accordingly,

**IT IS HEREBY ORDERED:**

1.    That the Magistrate Judge's Report and Recommendation [#67] filed on August 25, 2009 is **ADOPTED and SUSTAINED** as to grounds four, five, eight, nine, ten, eleven, thirteen, fourteen, sixteen, seventeen, eighteen and nineteen.

2.    That Petitioner Eugene K. Jones' objections to the Magistrate Judge's Report and Recommendation [#68] and [#69] are **OVERRULED** as to grounds as to grounds four, five, eight, nine, ten, eleven, thirteen, fourteen, sixteen, seventeen, eighteen and nineteen and **SUSTAINED** as to ground fifteen.

3.    That Petitioner Eugene K. Jones' Petition for Writ of Habeas Corpus [#3] and [#19] are **GRANTED in part and DENIED in part**. Petitioner's petition is **GRANTED** on petitioner's claims that he was

-37-

improperly denied the right to represent himself at trial.  The Petition is **DENIED** in all other respects.

4.      That the Judgment and Sentence in <u>State of Missouri v. Eugene Jones</u>, Case No. 011-1939A is **VACATED.**

5.      That within ninety days after this Order becomes final (including any appeals that may be taken), the State of Missouri must commence a new trial; if the State does not do so within ninety days, Respondent must release Petitioner from custody.

6.      That Jones is not entitled to a Certificate of Appealability on his remaining claims.

Dated this 29th Day of September, 2009.


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE